UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

UNITED STATES OF AMERICA

v.                                          Case No. 3:24-CR-9

DAVEY JOHNATHAN SISK

## SENTENCING MEMORANDUM OF DAVEY SISK

Davey Sisk deeply regrets the actions that have brought him before this Court.  In sentencing him, he asks this Court to recognize both the mitigating effects of his past that led to his present offense and the long-term impact of the conviction on his future.  While his offense is serious, he respectfully requests a sentence between 300 months (25 years) and 348 months (29 years).  Any sentence in this range is severe and sufficiently addresses the seriousness of the offense.  It is also essentially a life sentence as it is about as long as Mr. Sisk has been alive.  In support of this recommendation, Mr. Sisk states:

I.    **Nature and Circumstances of the Offense and History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))**

A.  **Davey Sisk**

"I felt like Frankenstein…a monster…For the longest time, since I was little, I felt like there was something wrong with me. Like deep down. There was pain…pain and sadness deep down, but…I didn't know what to do…I needed help, I can see that now. I needed help. I wanted help, but I didn't get any. I didn't know how or that I could, even when people tried. I didn't know how to reach out or even if I could. I can see now…after all that's happened…how bad the feelings were. I wish I'd gotten help. Therapy. Now that I've opened that door. I need it and I want it. I want

help…I can't change what I've done. The things I've done and how far it went, but I want to be better now…" – Davey Sisk

Davey Sisk was born on October 11, 1994 to James (Jamie) Sisk (22) and Jennifer Sowers (17). Davey was named after his father's favorite NASCAR driver, Davey Allison. Though only a teenager, Jennifer was largely estranged from her parents due to severe and regular physical abuse. Because of his parents' age and Jennifer's tumultuous homelife, all three lived with Jamie's parents, Jimmy and Nancy Sisk.  Davey's grandparents became his primary caregivers, though his parents continued to reside in the Sisk home.

The Sisk household was a hotbed of abuse and violence before Davey's birth. Davey's grandfather, Jimmy, stood 6'6'' and was a violent alcoholic, who routinely brutalized his diminutive wife, Nancy Sisk. Mrs. Sisk reported, "I loved that man, but he was a hellraiser. He once put a pistol to my head and told me he loved me so much he wanted to kill me and that he surely would if I ever left him. I never would have though, and I never did. I loved him." She continued, "He could be a good man and was sometimes." Mrs. Sisk recounted another time when her husband shot at the family car, while she was hiding in it.  She reported that on another occasion she attempted to walk to a friend's house after her husband had viciously beaten her while drunk at their home. She escaped and retreated into the woods, hoping to find her way to the friend's home nearby. She became lost, and, while searching for her bearings down a path, someone

grabbed her ankles. Her husband emerged from a hiding spot where he had covered himself with leaves and brush. She said he beat her with a stick and dragged her back home. "He was like a monster. It was like from a scary movie. He'd hid there and sat there waiting on me." Mrs. Sisk reported she was hospitalized or visited the ER numerous times due to injuries she endured at his hands. She said, "I got broken ribs a time or two. He messed up my face. There was a lot of it. When he drank, he transformed."

Mrs. Sisk reported that her husband also was violent towards their son, Davey's father. However, there was a change when Davey was born. Though his heavy drinking continued unabated, James Sisk vowed to "straighten up" and stop physically abusing his wife. He promised to never lay hands on his grandson and never did. Mrs. Sisk stated that her husband's abuse of her did not end completely; he continued to physically assault her, but only behind closed doors or when Davey was in school. Davey cannot recall ever seeing his grandfather physically abuse his grandmother, but he was aware of the abuse.

Davey reported that his grandmother would often tell him tales of his grandfather's drunken abuse when they were alone together. Davey said, "It was just something I knew…like lore…everybody knew it. It was sort of legendary…Everybody knew about it. I guess he was a real son of a bitch…I didn't really see that side though; with me he was good." Davey was aware that his grandfather's abuse significantly diminished after his birth. "That wasn't lost on me." He said that even as a child he felt

like he was there, in some way, to protect his grandmother. "He wouldn't kill her or do anything bad while I was there…It was a responsibility, I guess. I felt like I needed to be there. It felt good. I was protecting her. I was keeping everyone safe from the way he was."

Despite the horrific family lore, Davey and his grandfather shared a warm and special relationship. From an early age, Davey and his grandfather became inseparable, constantly outdoors. Davey said, "From as far back as I can remember, he was my best friend. My first friend and the best friend I could've ever had. He was scary too, but not to me. I knew he was scary, that he could be a different person, but with me it was different. I got the best of him. All the best parts of him." Davey preferred to spend time with his grandfather than with school friends. "It was like he was more my dad than my dad. He raised me, but he was my friend too. Best friend. I almost saw my dad as just some guy who worked with my granddad than my actual parent. More like an uncle or something…" Davey similarly considered his grandmother as his primary maternal figure. "She really was my mom…more than my mom."

A few years after his birth, his parents moved out of the Sisk home and into their own place. Davey remained with his grandparents, and he has never understood why his parents abandoned him when he was a child. His confusion grew when, shortly after their departure, Davey's parents had their second child, a daughter, Allison, also named after the favorite stock car driver. Davey remained with his grandparents, but Jamie and

Jennifer decided to raise their daughter themselves. Though Davey said he thought little of it at the time, and relished his close bond with his grandparents, over time he began developing complicated feelings about his parents' new life with his little sister.  He said,

> "It was difficult, like, they chose her over me…they wanted a new life, with their new kid, without me. They wanted a life where I wasn't really a part of it. I was a mistake or something they didn't want to be reminded of…I couldn't really see it at the time, but something ended then. They'd never really been there for me. It was always really my grandma and grandpa who were raising me…but something ended then. They chose to leave me. I still saw them all the time, but it was different. There was distance. I wasn't theirs. They didn't want me, I guess. I can look back now and see, I guess, that I had a lot of anger and a lot of sadness about not having my parents. They were there but not there. They were nice to me and loved me and I loved them, but it wasn't normal. I wanted something from them. I needed something from them that I never had and couldn't get…I think all kids want a family and to be wanted and loved, and I wasn't…"

Around this time, both of Davey's parents began struggling with their own addictions. Davey's father, like his grandfather, had become an alcoholic, and his mother developed an addiction to prescription drugs and cocaine. Allison Sisk stated, "I didn't know as a baby, of course, but I was perceptive and even when I was little, I knew what was going on. My dad would drink, but I noticed my mom, sometimes so flat and out of it, always sneaking away to the bathroom, locking herself in there for stretches…if I didn't know specifically, I knew something was going on with her…with both of them…they were struggling…I don't know that Davey saw it. He wasn't there in the house, but I know he felt it. The real distance but also them drifting away, you know?"

Davey was born with a rare physical developmental condition, Hemihyperplasia, where one half of his body grew at a much faster rate than the other, including his organs and skeleton.  *See* https://www.childrenshospital.org/conditions/hemihyperplasia (last accessed October 13, 2024).  This condition also brings with it the increased risk of benign or malignant tumors, most commonly in the kidneys. *Id.* Davey had at least ten tumors surgically removed from his body when he was a baby, and his childhood was marked with many hospitalizations and doctor visits.  He felt like a science experiment being examined by doctors and medical researchers from around the world. As Davey entered adolescence the physical abnormalities were visibly apparent. Davey wore special shoes as one leg was several inches longer than the other. One arm hung noticeably longer on his body. One eye was visibly larger. Davey said,

> "I mean, yeah, it was a thing…a weird thing, you know? Half of me was bigger and longer and stuff. People would look and stare. It would've been hard not to. Yeah, it was hard sometimes…kids are mean…it was a thing…When it wasn't a thing was when I went home. At home, my grandparents treated me normal. I was normal. They treated me like I was a normal kid, ya know?"

Davey would sometimes cry because of bullying, because his body hurt, or because of exhausting medical examinations and procedures, but mostly he suppressed his feelings. Allison Sisk notes,

> "My brother always downplays his trauma stuff. Even now. I remember. I was little, but I knew. I could see with my eyes that he was different. I knew people at school would talk about it. Bully him. Tease him. He wouldn't

usually get emotional or anything, but I could see it. I was a little girl, and I could see the pain behind his eyes. There was a lot going on inside him."

Allison continued,

"Davey wasn't social. I feel like his medical, physical stuff played a role in that. He didn't have friends, really. It was just him and Jimmy (his grandfather) out in the woods alone…always alone."

Davey resided briefly with his parents between 2005 and 2008 so he could go to the "new" middle school. However, even then, he continued to spend most of his free time with his grandfather. Davey said, "I slept there, but it wasn't really my home. It didn't feel like it. I'd be there and my mom would be doing what she was doing (drugs), and my dad would drink…Calvert whiskey and Fanta, that's what he and my granddad drank."

Davey returned to his grandparents' home for high school. Shortly after returning, Davey had surgery that corrected many effects of his Hemihyperplasia. With his physical abnormalities diminished, Davey became more social. He played football and developed a small friend group and began dating. Davey reports he did struggle socially somewhat because he refused to "party" due to his regular and lifelong exposure to the negative effects of drug and alcohol abuse.

As Davey neared the end of high school and entered early adulthood he suffered a series of traumatic personal losses. In 2011, Davey's father fell from a tree he was clearing. The injuries he suffered made it impossible for him to return to work, and his

drinking escalated. On March 28, 2012, during Davey's junior year in high school, he died of alcohol related illness. He was 40 years old.

Davey graduated in 2013 and soon afterward his aunt, Robin Sisk – his father's younger sister – died of an overdose.  Robin was only 33 years old. She had two young children under the age of six, Davey's cousins, who moved in with Davey and his grandparents. In August of 2015, Davey's mother also suffered a drug overdose. She was briefly hospitalized before dying at age 38. When Davey speaks about his parents' passing, he becomes overcome with emotion. He sobs, shudders and loses his breath. He said, "It was so broken. They were my parents, but not. They were always there, but never there for me. They didn't want me, and I wanted them. But…I wanted to have a relationship with them, more of a relationship, but then they were gone…They both left me again, one right after the other."

Davey was also devastated by his grandfather's passing in early 2015. Jimmy Sisk struggled with heart disease for many years, and, in 2014, his health began to decline precipitously. Nancy Sisk reported that her husband's heart issues were deeply tied to his decades of alcoholism. Davey sat by his grandfather's bedside day and night. Davey said, "I felt like if I was there with him, I could keep him safe. Keep him alive." Davey's grandmother said, "I'd come in and there he'd be with Jimmy in his arms like he was a baby. Jimmy was a big man, but he'd withered, and Davey could hold him just like that…It broke my heart to see that, because we knew, I knew, it wouldn't be long…But I

could see in his face, in his eyes, that Davey thought he could save him and protect him from dying."

Davey's grandfather died on February 22, 2015. Davey was 20. Davey was cradling his grandfather in his arms when paramedics arrived at the home and pronounced Jimmy Sisk dead.  His grandfather's death shook Davey to his core. It changed him. Allison Sisk said,

> "Davey took granddad's death bad. He was the closest with him…When Jimmy died, part of Davey died too. You could see it in his face. A light went out in him. I know he should have gone to therapy. He knows it now too, but he wouldn't. We were in such a tough, like masculine, world…our family. He just pushed everything down, but he was broken. 'Don't show feelings and just deal with it', like that attitude, that was Davey. But you could see it. The pain."

Following his grandfather's death Davey retreated online. He had always enjoyed video games, but he soon began playing habitually, sometimes for over 18 hours in a stretch. Davey made friends online gaming, and they would chat all night while they played. Davey said the online community felt safe to him. He felt protected and in control, something he'd rarely felt to this point in his life. Davey said, "In games there are rules. You can learn the rules, learn the maps, and you can become perfect, or almost perfect. You can be the driver; you can be in control of what's happening and keep bad things from happening. There's a way to play where you can protect everyone".

Davey also began compulsively viewing pornography online. Sometimes he'd both game and view pornography simultaneously for hours at a time. Davey said, "You

know it may have been better, but I could have had a beer or a shot to relax or gotten high or something, but I didn't want that. I saw what liquor and drugs did to everyone I ever cared about. I wasn't going to lose control like that, but I guess impulses, addiction, I guess, whatever is inside of me found something else…" Davey said his pornography viewing became "like an addiction." Like other addictions, his tolerance increased, and he began viewing more and more extreme material, paving the way for his involvement in this offense.

Around the same time that Jimmy Sisk died, Davey began dating Anna Layher. Davey had known Ms. Layher since high school. She had previously dated a friend who Davey played video games with. Davey's relationship with Ms. Layher was tumultuous and the couple regularly fell into destructive a "break up, make up cycle."  During a period when the couple was together in early 2016, Ms. Layher informed Davey she was pregnant and that he was the father. Davey spent the duration of the pregnancy believing he was on the cusp of becoming a father. Davey had longed to be a father and saw it as an opportunity to correct the chaos that permeated his upbringing. However, Davey discovered almost immediately after the child's birth that Ms. Layher had lied to him, and that he was not the child's biological father. Davey ended the relationship with Ms. Layher, though the two remained in contact. The next year, in 2017, Davey moved on and got engaged to Courtney Walker. The same year, Ms. Walker gave birth to a child who Davey believed to be his. The couple married in 2018. Around 2021, shortly after Ms.

Walker gave birth to Davey's only biological child, J.S., he discovered that Ms. Walker's first child that he'd believed to be his was not. Davey ended his marriage to Ms. Walker.

Following the end of his marriage and the consecutive betrayals of his romantic partners, Davey again retreated online. His use of pornography escalated. Nancy Sisk reported, "He got to be like a ghost. He'd rarely come out of the room in the basement. If he did, he'd come up angry, or irritated. It would remind me of how Jimmy would get. He'd stay up all night down there playing games and being on his phone. The only times he seemed right was when he was with his son" Allison Sisk said, "Davey was never violent. He never fought, and rarely shouted or anything like that, but sometimes…sometimes he'd come up from his basement and his eyes would be…like nothing I'd ever seen. He was so angry. I knew something was wrong. I didn't know how wrong, how far he'd strayed from normal. He needed help. I wanted to get him help, but…I didn't. I hope he can get some help now".

**B. The Offense**

The Statement of Facts and the Presentence Report (PSR) describes the offense conduct.  The offenses are deeply troubling. The conduct is serious, and Mr. Sisk understands he deserves a severe punishment.  There are, however, several mitigating facts present. First, the videos were not distributed beyond Mr. Sisk and Ms. Lahyer. Second, they were not made for financial gain or greater distribution.  Finally, Mr. Sisk

did not engage in the physical abuse of the children depicted in the videos.[1]  While he

encouraged it, Ms. Layher was the perpetrator of the conduct. Her conduct is more

egregious and deserves a greater punishment because she was the person in position to

protect the minor victims.  Though she claims that Mr. Sisk manipulated her, theirs was

clearly a mutually dysfunctional relationship that involved deceit and manipulation by

both parties. Ms. Layher sought a romantic relationship with Mr. Sisk and was willing to

victimize children to get it.

### C. Sentencing Guidelines (18 U.S.C. § 3553(a)(4))

Properly calculating the guidelines is the starting point of any sentencing.  The

Presentence Investigation Report (PSR) assigns Mr. Sisk a total offense level of 43,[2] which

results in a recommendation of a life sentence for every criminal history category.

Though the court is required to consider the sentencing guidelines recommendation in

---

[1]  The government alleges that Mr. Sisk physically abused the children himself, but there is no reliable evidence of this allegation.  Anna Layher denied this during her initial interview with law enforcement.  MV2 also denied it during a forensic interview.  Though the government has submitted drawings allegedly made by MV 2 during therapy as evidence that Mr. Sisk physically abused her, Mr. Sisk has objected to the admission of this evidence.  There is no indicia that this evidence is reliable.  Prior research has shown that children's testimony may be inaccurate due to a susceptibility to false memory, in particular false memory resulting from suggestion. *See, e.g.,* SJ Ceci, RD Friedman, *The suggestibility of children: Scientific research and legal implications,* Cornell L.Rev., 2000.  Because the child's testimony is so important and may be the only evidence of the alleged abuse, proper interview techniques must be used to safeguard children's testimony from the effect of misinformation and suggestibility, as these could lead to false reports. The government has provided no reasons to believe that the evidence it submitted was obtained in such a way to erase any concerns about its reliability.

[2]  Technically, the PSR assigns Mr. Sisk a total offense level of 48, however, this is incorrect because 43 is the highest offense level, and a total "offense level of more than 43 is to be treated as an offense level of 43." U.S.S.G. Ch. 5, Pt. A, Sentencing Table. Comment. (n. 2).

every case as one of a myriad of sentencing factors, the guideline recommendation is not helpful here because it does not meaningfully distinguish between Mr. Sisk and other offenders with prior sex offenses.

First, the "pattern of activity" enhancement provides five additional levels for facts that are already taken into account elsewhere in the guideline calculations, thus resulting in a sentencing recommendation that is greater than necessary.  Second, U.S.S.G. § 2G2.1 was not developed by the Sentencing Commission through its traditional methods of empirical study and fails to differentiate between cases with less egregious facts, thus resulting in a sentencing recommendation that is greater than necessary.

### 1.     Section 4B1.5(b)(1) Enhancement

Section 4B1.5 provides for enhanced punishment for offenders who pose a continuing danger to the public.  Subsection (a) provides enhanced penalties for offenders whose instant offense is a specified sex crime and who have *previously committed* <u>and</u> *been convicted* of at least one sex offense.  Subsection (b) provides enhanced penalties for offenders who do not have a prior conviction but who have engaged in prohibited sexual conduct with a minor on at least two separate occasions. The government argues – and the PSR finds – that Mr. Sisk qualifies for an enhancement under subsection (b) because he had not previously been convicted of any sex offense at the time of these offenses.

As applied, however, § 4B1.5 does not successfully differentiate between offenders who pose a serious and continuing threat to the community and those who do not.  As applied to the current guidelines in the PSR, § 4B1.5 does not differentiate between offenders who have a previous conviction and nonetheless commit another sex offense and those, like Mr. Sisk, who do not.  In both cases, the effect of this enhancement would be guidelines that recommend life in prison.  Although, Mr. Sisk's case is aggravated by there being more than one child involved in these offenses, considering the facts of the case and other sentencing factors as outlined herein**,** a five-level enhancement overstates the seriousness of the continuing threat posed by Mr. Sisk.

The absurdity of this enhancement is further demonstrated by the fact that, in Mr. Sisk's case, had he actually been convicted of a sex offense before committing these offenses, he would fall under subsection (a) of Section 4B1.5, which ***would result in the exact same advisory guideline range.***  Under part (a)(1)(A), Mr. Sisk's offense level would be 46 (the offense level determined under Chapters Two and Three), and under (a)(1)(2) his criminal history category would be increased from I to V, resulting in a guideline range of Life after credit for acceptance of responsibility (total offense level 43).  ***Part (a) does not add five additional levels to the total offense level like part (b) does even though part (a) offenders have already been convicted of a sex offense.***  This simply makes no sense.

14

The five-level enhancement under this section is also unnecessary because the aggravating factors are already accounted for elsewhere in the guideline calculations. The fact that there are three victims is taken into account by the fact that the offenses are not grouped. Instead, the offenses are considered separately, and Mr. Sisk received a two-level increase in his offense level due to the separate victims/groups. PSR, ¶ 72.

**2.     U.S.S.G. § 2G2.1 Not Developed Based on Study of Empirical Evidence**

U.S.S.G. § 2G2.1 as it currently exists is "fundamentally different" from most other guidelines and, unless it is "applied with great care," it can lead to unreasonable sentences that are inconsistent with what § 3553(a) requires. *United States v. Dorvee*, 616 F.3d 174, 184 (2nd Cir. 2010). Sentencing Guidelines are usually developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices. *See Rita v. United States*, 551 U.S. 338, 349 (2007). In the formulation of the child pornography guidelines, however, the Commission did not use this empirical approach; instead, the Commission has amended the Guidelines under § 2G2.1 several times since their introduction in 1987, specifically responding to the direction of Congress and each time recommending harsher penalties.  *See* United States Sentencing Commission, *The History of the Child Pornography Guidelines*, Oct. 2009, *available at* https://www.ussc.gov/research/research-reports/2009-history-child-pornography-guidelines (last accessed October 15, 2024). When §2G2.1 was created in 1987, it had a base offense level of 25 and contained only a single specific offense characteristic (a 2-

level increase if a minor under the age of 12 years was used in the production).  USSG §
2G2.1 (1987).  Over the years, the Commission has amended Section 2G2.1 thirteen times,
increasing the base offense level and adding enhancements, mostly as a result of
Congressional directives.  USSC, *The History of the Child Pornography Guidelines* at 249.  For
example, the Sex Crimes Against Children Prevention Act of 1996 increased the base
offense level from 25 to 27 and added a two-level increase if the offense involved the use
of a computer. *Id.* In 2004, the Commission implemented the 2003 Prosecutorial Remedies
and Other Tools to End the Exploitation of Children Today Act ("PROTECT Act") by
increasing the base offense level from 27 to 32 and added enhancements for offenses that
involved the commission of a sexual act, aggravated sexual abuse, or material portraying
sadistic or masochistic conduct.  *Id.*  The current version of Section 2G2.1 has a base
offense level of 32 and six separate offense characteristics, along with a special instruction
related to multiple victims.

Along with the implementation of these directives from Congress, the average
sentences for production offenses necessarily increased.  The average prison sentences
for production offenses in 1992 was 63.5 months, which increased to 153.4 months in 2004,
the year after the PROTECT Act was enacted.  *Id.* at 253.  Sentences continued to increase
as more offenders were subjected to the increased penalties of the PROTECT Act, and
average sentences under the production guideline were 282.9 months by 2009. *Id.*

In sum, the current guideline is largely the product of Congressional directives rather than Commission study and expertise.   The Supreme Court has held that a sentencing judge need not defer to such a guideline.   *See Kimbrough v. United States*, 552 U.S. 85, 109-110 (2007).   Indeed, judges across the country have recognized the flaws in this guideline and have routinely declined to impose a sentence within the range it recommends.   Though the average sentences for production offenses remain high, they are significantly lower than the guidelines recommendation here.   For example, United States Sentencing Commission's statistics show that judges around the country are routinely imposing below-guideline sentences under Section 2G2.1.   Judiciary Sentencing Information (JSIN) data attached to the Presentence Report shows that in the last five fiscal years, only 24% of defendants with the same offense level and criminal history category as Mr. Sisk received a within guideline range sentence. PSR at *31. Seventy three percent (73%) of all defendants in the same categories received downward departures or variances. *Id.* In fact, over the last five fiscal years, the average sentence for all 824 defendants with a final offense level of 43 and a Criminal History Category of I was 348 months – 29 years.

While the government argues that Mr. Sisk should receive a 40-year sentence because Anna Layher did, such a sentence would create an unwarranted disparity between Mr. Sisk and other similarly situated defendants.   There is a significant difference between Ms. Layher and Mr. Sisk that warrants different sentences – Ms.

Layher is the person who physically abused the children here, not Mr. Sisk. Further, she was in a position of trust and care over the children. A recent Sentencing Commission study conducted in 2021 found that child pornography production offenders with closer relationships to their victims received longer sentences. USSC, *Federal Sentencing of Child Pornography Production Offenses,* (October 2021) at *45. Specifically, the Commission found that courts imposed the longest sentences, on average, for child pornography offenders who were the parents of the victims (340 months). *Id.* Remote offenders (those who were not present in the same location as the victim) received significantly shorter sentences, with an average sentence of 234 months. *Id.* at *44.

The history of Section 2G2.1 demonstrates that its recommendation is of little assistance to the court in determining the appropriate sentence and should not be given much weight. It is also clear that courts around the country are routinely varying below the guidelines' recommendation significantly.

## II.     Seriousness of the Offense, Respect for the Law, and Just Punishment (18 U.S.C. § 3553(a)(2)(A))

The present offenses are serious offenses for which Mr. Sisk needs to be punished. However, considering the average sentence for similarly situated offenders, the facts that Mr. Sisk has no prior criminal history, has never served a day in jail before his arrest on February 15, 2024, and will never again be in a position to commit such an offense given the severe and lasting sex-offender restrictions he will face in the future, a sentence

between 300 and 348 months is sufficient to reflect the seriousness of the offenses and justly punish him.

## III.   Adequate Deterrence (18 U.S.C. § 3553(a)(2)(B))

In addition to reflecting the seriousness of the offense and the need to protect the public, a sentence must be sufficient, but not greater than necessary, to deter the individual being sentenced as well as the general public from committing crimes.  The Sentencing Commission has recognized there is no evidence that increases in sentences do in fact deter crime. Instead, research has generally shown that "increases in the *certainty* of punishment, as opposed to the *severity* of punishment, are more likely to produce deterrent benefits."  *See* Valerie Wright, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, The Sentencing Project (Nov. 2010).

The Department of Justice acknowledges the fact that the certainty of being caught is a vastly more powerful deterrent to crime and that the severity of punishment is an ineffective deterrent to crime.  *See* National Institute of Justice, *Five Things About Deterrence*, July 2016, available at https://www.ojp.gov/pdffiles1/nij/247350.pdf. Therefore, the fact that Mr. Sisk is being sentenced at all will achieve the same amount of general deterrence, regardless of the length of his sentence.

## IV.   Protection of the Public (18 U.S.C. § 3553(a)(2)(C))

In considering the need to protect the public, it is important to consider that Mr. Sisk will never again be in a position to commit such an offense. When Mr. Sisk is

released, he will have at least five years – and likely many more – of supervised release, where he will be subject to rigid rules that will not allow him to associate with minor children except in the presence of responsible adults.   He will also be subject to registration as a sex offender.   He will have limited or monitored access to computers and social media. In short, he will not have the opportunity to commit such offenses.   There is nothing in Mr. Sisk's history that suggests he will not be amenable to the rules and structure of supervised release and, accordingly, he will not pose a threat to the public upon his release from incarceration.

## V.      Rehabilitation (18 U.S.C. § 3553(a)(2)(D))

Clearly, Mr. Sisk needs mental health counseling to address the unresolved issues related to his present sex offenses and the loss and abandonment he suffered as a child. This will enable him to confront the issues that contributed to his uncharacteristic criminal behavior and learn healthy ways to cope with them.   An inordinately long prison sentence will not facilitate the treatment that Mr. Sisk obviously needs.   A period of supervised release, which can be no less than five years and up to life (PSR, ¶ 108), in conjunction with the mandatory sex offender registration requirements, will serve to allow Mr. Sisk to have the appropriate guidance, discipline and structure that will help him rehabilitate himself and be a productive member of society.

## VI.   <u>Unwarranted Sentencing Disparities (18 U.S.C. § 3553(a)(6)</u>

Section 3553(a)(6) requires the court to consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  This is an important consideration here because, as noted above and in the JSIN data, courts around the country and in the Western District of Virginia have increasingly been imposing sentences below the advisory guideline range in child pornography cases sentenced under both § 2G2.1 and § 2G2.2. Further, a sentence at the high-end of the agreed upon range as suggested by the government here would create an unwarranted sentencing disparity given the sentences imposed in cases considering similar facts.  Though the government provided the court with four cases in which very long sentences were imposed and affirmed by the Fourth Circuit, it ignores the overwhelming support for a lower sentence.

Courts that have considered analogous facts have arrived at sentences far lower than the 480 months that the government advocates for here.  Contrasting the *United States v. Blankenship* case cited by the government, in *United States v. Culliper*, Judge Jones sentenced a defendant to the mandatory minimum sentence of 180 months.  No. 2:07-cr-1, 2007 WL 1830711 (W.D. Va. June 25, 2007).  The defendant was convicted of two counts of production of child pornography and three counts of possession of child pornography after he installed a wireless camera in the victims' bathroom and recorded videos of the victims changing and showering.  *Id.* at *1-4.  The defendant was a 56-year-old Navy

veteran *who had previously molested his daughter* when she was a young child.  *Id.* at *4 (emphasis added). The victims were relatives of the defendant and were between twelve and sixteen years old.  *Id.*

In arriving at his sentence, the Court focused on the characteristics of the offense. Judge Jones remarked that the video recordings were "far from any extreme in the continuum of child pornography."  *Id.* at *5.  Furthermore, the defendant has not "distributed the recordings to others or had any intent to do so, a fact distinguishing his conduct from that of many producers of child pornography."  *Id.*  Instead, the defendant's "intent was to satisfy his own obsessions, without any commercial or financial motivation."  *Id.*  The court held that "[t]hese facts clearly bear upon the court's necessary examination of the 'nature and circumstances of the offense,'" and led to the mandatory minimum sentence.  *Id.* These factors likewise apply in Mr. Sisk's case.

The court looked to similar considerations in *United States v. Bruffy*, No. 6:11-cr-6, 2012 WL 1003503 (W.D. Va. Mar. 26, 2012).  There, Judge Moon sentenced a defendant who had been convicted of two counts of production of child pornography and one count of possession of child pornography to 276 months of imprisonment.  *Id.* at *1.  The defendant had surreptitiously filmed a minor male child bathing and taken pictures of the genitalia of that child and a minor female while both were sleeping.  *Id.* at *4.  As discussed in Section B.1., the 276-month sentence considered the U.S.S.G. § 4B1.5(b)(1) pattern-of-abuse enhancement.  *Id.* at *1.

Even when more egregious facts were present, courts in this district have sentenced defendants substantially below the government's present request. For example, in *United States v. Miller*, No. 6:11-cr-4 (W.D. Va. Oct. 30, 21012), the Court imposed a 300-month sentence on a 57-year-old man who drove a missing minor from Michigan to Virginia, without her mother's permission, and took pictures of her engaging in sex acts with him. *United States v. Miller*, 534 F. App'x 204, 206-08 (4th Cir. 2013); *see also United States v. Miller*, No. 6:11-cr-4, 2015 WL 4162814, at *1 (W.D. Va. July 9, 2015), *appeal dismissed*, 622 F. App'x 288 (4th Cir. 2015) (providing history of case in habeas proceedings). This sentence, for conduct that involved kidnapping and oral sex, was still substantially less than the 480 months requested by the government here. Mr. Sisk's conduct was less egregious than the conduct in these cases because he did not touch the children, and his sentence should reflect that.

Finally, district courts throughout the Fourth Circuit have frequently sentenced defendants facing these or similar charges to sentences significantly below that requested by the government. Or, if a longer sentence was imposed, the case involved significantly more egregious facts. For example, the Fourth Circuit affirmed a 540-month sentence (not significantly longer than the sentence the government advocates for here) for a defendant who engaged in the hands-on sexual assault and production of child pornography with *at least ten different children*, who had several of the children engage in sexual acts with himself and other adult male customers, and who was *twice previously convicted* for

sexually abusing children – in 1997 for taking indecent liberties with a three-year old to arouse himself sexually and in 2000 for taking indecent liberties with an 11-year old to arouse himself.  *United States v. Bailey Joe Mills,* 850 F.3d 693 (4ᵗʰ Cir. 2017).  Similarly, the Fourth Circuit affirmed a 360-month sentence (120 months *less* than the sentence the government seeks in Mr. Sisk' case) for a defendant who had sexual contact – including sexual intercourse and oral sex --with his prepubescent daughter from age four and a half to seven years old and produced 260 images and 102 videos of the victim engaged in sexually explicit conduct.

The cases in the chart below include cases from the Fourth Circuit[3] and across the nation in which courts imposed sentences dramatically shorter than the sentence sought by the government here for conduct that is at least as egregious.  These cases underscore what the JSIN data shows – that courts around the country are routinely imposing below guideline sentences in these cases and that the advisory guideline range under § 2G2.1 does not meaningfully assist the court in determining an appropriate sentence.

| Fourth Circuit: | Sentence |
|---|---|
| *United States v. Johnson,* **680 F.Appx.194 (4ᵗʰ Cir. 2017)**<br>• Defendant had sexual contact, including sexual intercourse and oral sex, with his prepubescent daughter from age 4 to 7.5 years<br>• Produced 260 images and 102 videos of the victim engaged in sexually explicit conduct | **360 months** |

___

[3] While the Fourth Circuit was not considering the reasonableness of each of these sentences, the decisions helpfully recount the facts surrounding the various district court sentences.

| Fourth Circuit: | Sentence |
|---|---|
| *United States v. James Arbaugh,* **951 F.3d 167 (4th Cir. 2020)**<br>• Defendant charged with violation of 18 USC § 2423(c) based on molesting over 20 children in Haiti where he was missionary | **276 months;** Lifetime supervised release |
| *United States v. Blank,* **659 F.App'x 727 (4ᵗʰ Cir. 2016)**<br>• Two counts of production and one count of possession of child pornography<br>• Defendant repeatedly had sex with 15-year-old stepdaughter | **360 months;** Lifetime supervised release |
| *United States v. Silva,* **643 F.App'x 306 (4th Cir. 2016)[4]**<br>• Coercing a minor to produce child pornography | **262 months;** Lifetime supervised release |
| *United States v. Rodriguez,* **589 F.App'x 148, 149 (4th Cir. 2015)**<br>• Four counts of production | **180 months;** 5 years of supervised release |
| *United States v. Malloy,* **568 F.3d 166, 170-71 (4th Cir. 2009)**<br>• Rejecting mistake of age defense and other challenges and affirming mandatory minimum sentence of 180 months for defendant who produced child pornography of himself having sex with fourteen-year-old and another adult | **180 months;** 5 years of supervised release |
| *United States v. Crews,* **28 F. App'x 247, 249 (4th Cir. 2002),** *as modified* **(June 8, 2010)**<br>• Rejecting challenge to sufficiency of the evidence and affirming 100 month sentence for production and aiding and abetting production when two adult men picked up 14-year-old, took him to their house, had sex with him and videotaped it | **100 months;** 3 years of supervised release |
| *United States v. Buculei,* **262 F.3d 322,327 (4th Cir. 2001)**<br>• Affirming 240-month sentence for one count of production of child pornography, three counts of traveling interstate to engage in a sex act with a minor, and one count of obtaining custody of a minor with intent to produce child pornography | **240 months;** 5 years of supervised release |

---

[4] Mr. Silva's co-defendant, Tabatha Dianne Black, received a sentence of 210 months in prison, followed by Lifetime supervised release.

| Other cases nationally: | Sentence |
|---|---|
| ***United States v. John Holcomb***, **No. 21-cr-75 (W.D. Wash.)**<br>• Filmed his sexual abuse of 6-year-old girl left in his care<br>• Court called the case one of the most reprehensible it had ever seen, and the Guidelines recommended life in prison. *See* ECF No. 93 at *7.<br>• Mr. Holcomb created videos that showed him penetrating the girl with his erect penis. ECF No. 1 at *5-6. | **240 months**; Lifetime supervised release |
| ***United States v. Selina Wynne Duflo***, **No. 21-cr-153 (D. Or.)**<br>• Sexually abused her own 6-year-old child "over the course of more than a year" and sent videos to her romantic partner in California<br>• Also filmed and sexually abused 2-year-old<br>• Government agreed to recommend 240 months, even though guideline range was 360 months to life, *see* ECF No. 41 at *3<br>• Attempted to render her six-year-old child unconscious using over-the-counter drugs before having her romantic partner, Daniel Seibert, engage in sex acts with the child | **240 months**; 12 years supervised release |
| ***United States v. Daniel Seibert***, **8:20-cr-32 (C.D. Cal.)**<br>• Related to *United States v. Duflo* case above<br>• Guilty not only of sexually abusing Ms. Duflo's drugged six-year-old child but of (1) sexually abusing a 14-year-old girl *multiple* times; (2) inducing two *other* minors to send him explicit material online; and (3) possessing hundreds of images and at least 8 videos of child pornography | **292 months**; Lifetime supervised release |
| ***United States v. Kaleb Scott***, **22-cr-5256 (W.D. Wa.)**<br>• Produced and distributed pornography of him penetrating the buttocks of an infant, who was in his care, with his penis<br>• Government and defense jointly recommended sentence of 20 years, notwithstanding that advisory Guidelines range was *life* and that the defendant had a *prior juvenile record involving sexual misconduct* | **252 months**; Lifetime supervised release |

| Other cases nationally: | Sentence |
|---|---|
| **United States v. David Gfeller, 19-cr-6205 (W.D. N.Y.)**<br>• Defendant produced a series of pornographic images of his 4- to 7-year-old child, a series that was distributed far and wide overseas, including in Belgium, Germany, Italy, Portugal, and France<br>• Admitted manipulating his child's penis on "multiple occasions" "so that victim would become erect in order…to produce the child pornography." *See* ECF No. 1 at *8-9<br>• Defendant further admitted to masturbating to child pornography he received in exchange for the images of his son. *Id.* at *8. | **15 years**;<br>15 years of supervised release |
| **United States v. Martin Perea, 15-cr-3052 (D. N.M.)**<br>• Defendant produced 18 videos of ex-girlfriend's 7-year-old daughter, including videos of him penetrating her vagina with fingers and various inanimate objects<br>• When the victim's mother confronted him, he threatened to burn her house down<br>• Government and Perea agreed to sentence between 17-25 years | **300 months**;<br>25 years of supervised release |
| **United States v. Andrew Nicholas, No. 20-cr-949 (D. N.J.)**<br>• Producing and distributing images of child sexual abuse of infant/toddler in his custody<br>• Advisory guideline range of Life | **300 months**;<br>Lifetime supervised release |
| **United States v. Harvey Stewart, No. 20-cr-15 (M.D. Ga.)**<br>• Defendant posted images and videos of him digitally penetrating and rubbing the genitals of his young daughter<br>• Defendant further bragged about how he had groomed his daughter to be molested<br>• Government agreed not to argue for more than 25 years in prison | **276 months**;<br>15 years of supervised release |
| **United States v. Dylan Seader, No. 2:22-cr-69 (E.D. Va.)**<br>• Defendant initially arrested for attempting to have sex with undercover agent posing as a 14-year-old girl. ECF No. 31 at *2.<br>• Defendant admitted to chatting with *other* younger girls and to having child pornography on his phone. *Id.*<br>• After searching the phone, police found not only two known series of child pornography, but several videos of the defendant performing sex acts on an *18-month-old child* he was apparently related to. *Id.* | **240 months**;<br>Lifetime supervised release |

| Other cases nationally: | Sentence |
|---|---|
| *United States v. Jessica Barrington,* No. 19-cr-127 (E.D. Wa.)<br>• Defendant produced pornography of her own sexual abuse of her daughter and sent images of that content to at least ten men she met online.<br>• Defendant offered to a man that he could rape her toddler daughter<br>• Government agreed 20-year prison sentence was reasonable, even with a final offense level of 48 | **240 months**; Lifetime supervised release |
| *United States v. Katrina Adams,* No. 18-cr-31 (E.D. Wa.)<br>• Rule 11(c)(1)(C): Government and defense agreed to jointly recommend 25 years in prison even though offense level after acceptance of responsibility was 51<br>• Conduct included (1) filming her two-year-old daughter masturbating the defendant's boyfriend as the defendant called out instructions; (2) photographing herself masturbating and digitally penetrating the two-year-old's vagina; (3) graphically (and gleefully) offering, over the course of several *weeks* to have the boyfriend rape the two-year-old daughter; and (4) discussing sucking the boyfriend's young son's penis | **264 months**; Lifetime supervised release |
| *United States v. Alexander Capasso,* No. 16-cr-318 (D. N.J.)<br>• Rule 11(c)(1)(C) plea recommending a sentence of 15-20 years<br>• Took images/videos of himself molesting a young child over the course of *several months,* and *distributed* those images/videos<br>• Defendant conspired with his girlfriend, Janine Kelley, to engage in the sexual exploitation of children<br>• Janine Kelly was also sentenced to 12 years in prison for her role in engaging in sexually explicit conduct with two children | **240 months**; Lifetime supervised release |
| *United States v. Andrew Smith,* No. 20-cr-108 (D. Id.)<br>• Filmed and sexually abused a girl for *three years* from the age of 7 to the age of 10<br>• Defendant, who was the boyfriend of the victim's mother, would *slap* the girl if she resisted participating in the pornography; he gave her marijuana to reduce her inhibitions, he handcuffed her to the bed and forced her to give him oral sex; her taught her how to masturbate using dildos; and he forced her to receive anal sex on her 9th birthday. *See generally* ECF No. 23 at *3-6.<br>• Defendant had Life guidelines | **25 years**; 10 years supervised release |

VII.    **Restitution (18 U.S.C. § 3553(a)(7))**

  The government has not provided any documentation suggesting that restitution

is an issue in this case.

<b>CONCLUSION</b>

  For all of the reasons outlined above, a sentence between 300 and 348 months is a

severe sentence that serves all of the goals of sentencing in Mr. Sisk's case.

          Respectfully submitted,

          DAVEY JOHNATHAN SISK
          By Counsel

Counsel:

s/ Andrea L. Harris
Virginia State Bar No.  37764
Assistant Federal Public Defender
401 East Market Street, Suite 106
Charlottesville, Virginia 22902
Telephone: (434) 220-3380
Fax: (434) 220-3390
Email:  Andrea_Harris@fd.org

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 15, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which I will send notification of such filing to:  counsel of record; and I certify that I have mailed by United State Postal service the document to the following non-CM/ECF participants:  none.

s/Andrea L. Harris

Andrea L. Harris
